Secretary of Health and Human Services, NL. Mr. Byrne, for the accountants, is located at Ferguson. May I proceed? Thank you, Your Honors. Good morning, and may it please the Court. Michael Byrne, from Leisman & Watkins, for accountants, Ardelyx, the American Association of Kidney Patients, and the National Minority Equality Forum. By enacting the Medicare Improvement for Patients and Providers Act, or MIPPA, Congress created a prospective payment system under which a single payment is made to renal dialysis providers for renal dialysis services, as defined in subsection B14 of the statute. As CMS contemporaneously acknowledged, Congress created that prospective payment system to remove dialysis providers' financial incentives to overuse profitable drugs for which dialysis providers could, before MIPPA, receive separate payment from Medicare. In this case, however, CMS claims authority to expand the definition of renal dialysis services to include orally administered drugs that all agreed have never been administered during renal dialysis nor provided by renal dialysis providers. Not only is that claim of authority incompatible with MIPPA's language and purpose, but it will harm a patient population that already faces staggeringly high health risks. As advocates from across the kidney care community have repeatedly warned, placing oral-only drugs into an already overstretched prospective payment system will diminish access to lifesaving therapies and discourage the innovation that makes those therapies a reality in the first place. I'd like to proceed today in two steps. First, I'd like to briefly touch on why the district court was correct to hold that there is jurisdiction to reach the merits of our claims. And then I'd like to go through why the government's interpretation of the statute is untenable and why our interpretation of the statute is, therefore, the reading that's far more compatible with the statute's text and Congress's purpose in enacting MIPPA. Let me first touch on jurisdiction. Basically, we think that the district court got this right that, in this case, jurisdiction and the merits merge. I think you see this most clearly. Didn't the district court also find that preclusion applies? It did because it found that we lost on the merits. So, in other words, it found that there was jurisdiction to consider the merits. It just ruled against us on the merits. Really, I think the Amgen case is the key here. Amgen is very similar to our case. Both cases arise as an analysis of provisions that limit judicial review of certain actions that are taken under prospective payment systems under the Medicare Act. So, very similar settings. And, basically, what the court held in Amgen was that, you know, in that case, the question was there was a provision that limited judicial review of certain, quote, other adjustments that the secretary could make. And Amgen argued that the other adjustments that were made were outside of the agency's statutory authority. And what this court held in Amgen is that, given the overriding presumption that Congress intends for judicial review, the right way to handle to construe those provisions limiting judicial review is to construe the provision as being limited to the agency's authority to make that decision in the first place. And so, essentially, the court found that the jurisdiction and the merits merge. Really, the only distinction that the government has offered from the Amgen line of cases is to say, well, you know, they've argued that in Amgen there was an express cross-reference to another statutory provision that defined other adjustments. But as the district court noted, that's both factually inaccurate and it's also just a distinction without a difference. There was no express cross-reference there. And in both cases, it's a general principle. It's just that Congress, you know, doesn't create a situation in which an agency can simply point to some provision limiting judicial review and use that to justify any action that it wants, no matter how far outside of the statutory authority that Congress has defined. The district court didn't make any fines with respect to the APA. Well, the district court just ruled that we didn't have statutory authority. That's right. So, there didn't need to go further than that. So, that takes us to the merits. And what I'd like to go through is why we think the government's interpretation of the statute is untenable. The government primarily argues that oral-only drugs are part of the bundled payment through subsection B3 of the statute. And the way that they read—now, we think that their interpretation is sexually wrong. I'm happy to talk about that. But I think the easiest way to see that their interpretation of the statute is wrong is to look at what the consequences are of their reading. So, what they would say is that subpart B says that the term renal dialysis services includes other drugs and biologicals furnished to individuals for the treatment of end-stage renal disease in any oral equivalent form of such drug or biological. They say that what Congress was doing there was taking that first part of that subpart and providing that all drugs for the treatment of ESRD, no matter what their route of administration, that were in existence before 2011, would have been part of the bundle. So, this is what Congress would have intended at the time. And then the second part of the statute, they say, is designed to talk about drugs in the future. And so, according to them, what Congress was trying to do is to add into the bundled payment system all drugs for the treatment of end-stage renal diseases that existed before January 1, 2011, but the only drugs that would go into the bundle after January 1, 2011, at least through B3, were drugs that were the oral equivalent of drugs that were in existence as of January 1, 2011. Now, what's important is that no one, not even the government, claims that Congress could have intended that to be the entire universe of drugs that go into the prospective payment system. The reason for that is that it would mean that no injectable drugs, no intravenous drugs, no any drugs that came after January 1, 2011, would be part of the prospective payment system. And that's antithetical to what NIFA was trying to do. NIFA was concerned about the fact that dialysis providers were basically overusing particularly injectable drugs in a way that benefited their financial incentives but was unnecessary for patient care. And to read the statute, to read subpart B3 as the government wants to, would basically make it so that any new development that occurred after January 2, 2011 would be outside of the prospective payment system and exacerbate all the problems. Why wouldn't that fall under subsection 4? Yeah, so happy to address that. So I think that the main takeaway is that for the government's interpretation of B3 to be correct, they have to be right either that B4 covers all other drugs or that the statute provides free-flowing authority for the agency to expand on the definition of renal dialysis service. So let's talk about section 4. I mean, that just addresses kind of your policy-related argument. I hear you arguing that it must be so, otherwise we couldn't cover these other drugs. But if you can cover it under 4, then it's not a must-be-so situation. No, no, absolutely. In other words, nobody disputes that drugs outside of their interpretation of B3 are part of – how they say B3 should be interpreted are part of the Bible. For instance, the government has added other IV drugs that have come on the market since 2011. Even though under their reading of B3, that wouldn't be possible. So that brings up exactly the question that Your Honor just asked, which is, well, why can't it come under B4? And I think there's a couple of reasons why we can look to the statute and know that it can't come under B4. First of all, the government's theory is essentially that Congress in B3 created this very nuanced look for what kinds of drugs would be added to the prospective payment system. And it makes no sense to think that Congress would have defined renal dialysis services in a way to create that very nuanced set of drugs in B3 and defined it by the route of administration and the date of approval, but then used the very next provision in the statute to undo all that work by adding in all other drugs. It would make B3 essentially an elaborate pump fake that you would basically give superfluous by B4. And their reading, importantly, would render both B2 and B3 entirely superfluous. You know, what they want to say is that items and services should be read to include drugs within B4. But B4 extends the definition of renal dialysis services to diagnostic laboratory tests and other items and services not described in Clause 1 that are furnished to individuals for the treatment of end-stage renal disease. So Clause 1 just talks about items that are in the composite rate system that existed prior to January 1, 2011. So if drugs after January 1, 2011 was part of what Subpart B was covering, then that would render Subparts 2 and 3 of the statute entirely superfluous because there would be no reason to cover, you know, in a much more nuanced way, certain types of drugs because all drugs would come in under B4. And that's why I think in a way the government, you know, the government's argument on this has always been a little bit half-hearted. I mean, the government in page 58 of its brief, I think, recognizing the problems with this superfluity that would arise from this reading of B4, tries to argue that the drugs that are addressed by B4 constitute a different subset of drugs than those in B2 and B3. But that's just plainly inconsistent with the statutory language. You know, Subpart B4 expressly covers other items and services not described in Clause 1. If other items and services encompass drugs for the treatment of end-stage renal disease, then B4 would include all of the drugs in B2 and B3 and render those provisions superfluous. The better and more obvious reading of Subpart B4 follows from the structure of the four categories that Congress identified in the statutory definition. So Subpart 1 deals with everything in the composite rate system that existed up through December 2010. Subparts 2 and 3 then deal with the kinds of drugs that Congress wanted to add to the prospective payment system. And Subpart 4 deals with other items and services, in other words, items and services that aren't drugs, things like lab tests, syringes, the tubing supplies, the blood products, all that kind of stuff. And that is the kind of reading that basically makes sense of the whole statute and ensures that none of the different provisions are overlapping with each other. Mr. Byrne, having nicely dispatched B4, let's go back to B3. You read B3 as though it said, which it does not, a date in whatever was 2011. It doesn't say that. I agree with you, Your Honor. That's one of the problems with their interpretation of the statute. But what it says is before application of this paragraph. Right. This paragraph was first applied or could first be applied in 2020-2025 when the Congress finally let it go into effect. So two things to say about that. First of all, we think the application of this paragraph certainly began to apply. The application of the paragraph occurred in 2011. I mean, this is a paragraph. 2011 as a result of the paragraph. I'm sorry? What happened in 2011 as a result of paragraph B3? Drugs that fell within the category B3 were entered into the prospective payment system. The only drugs that weren't added in were oral-only drugs. In respect to the drugs in this case, this statute could not be applied before 2025. Well, we just kept delaying. Right. I mean, there are other provisions in the statute that used a date, right, or that date. This provision does not. Right. And, again, we would understand the application of this paragraph to be speaking to when did the statute take effect. It is true that the regulatory policy, you know, did not take effect. It didn't take effect until the Congress allowed it to take effect. Yeah, no, but even if you were to interpret application of this paragraph in that way, again, we don't think that that helps them in terms of the overall argument because, again, that would mean that. . . A lot of your argument is about how crazy it would be if it really says 2011. No. I mean, I think our. . . Well, it says 2011 for sure for all drugs that aren't oral-only drugs, right? So, in other words, even under the. . . The drugs in this. . . Or the drug in this case. Right, but that is. . . But the point is that drugs that treat renal dialysis services, the vast majority of the drugs that are used for renal dialysis services. And, again, we don't think that our drug is a renal dialysis service, but renal dialysis services are predominantly intravenously or injectably delivered drugs. So, no matter what one thinks about when the application of this paragraph occurred with respect to oral-only drugs, everybody agrees that the application of this paragraph with respect to injectable and intravenous drugs occurred January 1, 2011. So, even under the government's reading of the statute, they would say that Congress determined that after January 1, 2011, all new drugs that are intravenous or injectable do not fall within B-3. That's their view of the statute. Let's just really address Judge Ginsburg's point, because he's saying that under the first clause, any drug in biological, which includes oral drugs, before the application of this paragraph. And if we say that the application of this paragraph as to your client's drug is 2025, your client's drug is covered by the first clause. So, two things about that. Let me explain why I think that that's textually wrong, but I think the important thing to understand is if you read the statute in that way, it creates this framework that ultimately is inconsistent with Congress's intent. And that's why you have to know that that's not a fair reading of the statute. So, the first point is this. Where are you conjuring their intent, if not from the words of the statute? But I think this is a question where the statute can be read in one of two ways. They acknowledged, the agency acknowledged in 2008 that the statute could be read as we suggest. And the reason why they said that it could be read as we suggest is that, as everyone agrees, there's sort of two parts to subpart two. One is the first part talks about other drugs and biologicals that have furnished individuals, but then the second part talks about any oral equivalent form of such drug or biological. Now, if oral drugs were encompassed within that first part of the statute, that first part of the subpart, there would be no reason to separately identify oral equivalent forms. You would already have all oral forms would be part of the first part of the statute. The oral equivalent form is done after the date of application. Right. That's not superfluous. Well, so two things. One, oral equivalent form isn't subject to the application of this paragraph limitation. Right. So, that's exactly right. So, their view of the statute, just to be clear, their view of the statute tries to make sense and avoid the superfluity problem that we're discussing by saying that what Congress was trying to do was it was trying to add in subpart B3 all drugs up to 2011 that were injectable and intravenous, all oral drugs whenever Congress got around to allowing the agency's policy to let them come into the bundle, but then only one type of future drug. The only type of future drug that they wanted into the bundle was drugs that were the oral equivalent of injectable and intravenous drugs that were introduced before 2011. But that wouldn't be crazy given that you just said that almost all drugs are injectable, and so they might just be trying to, given that we've got the universe of injectable drugs, there's not as much innovation. I'm just giving you a hypothetical. Hypothetically, maybe there's not a lot of innovation in injectables, but there's a lot of innovation in orals. So we're just going to include those in the future. So first of all, it's factually inaccurate. You're saying that it's not crazy? No, no. I think it absolutely is crazy because what it would mean is that any time that a new version of an injectable drug came out, dialysis providers would have huge incentives to immediately switch to that drug, regardless of whether it was more cost effective, regardless of whether it was better for patients, because it would simply get them out from the auspices of the prescription payment system. Wait, didn't we get reimbursed under Subsection D for an injectable? I thought that was just prescription drugs. I could be wrong. So Part D is for prescription drugs. Part B, it would have been what covered things that were separately reimbursable before. But under their theory, anything that any injectable drug – How are injectables separately reimbursable under our hypothetical? Because I thought it was all Subsection D. No, Subsection D is only self-administered drugs. So Subsection D is how things would have been. So, for instance, before the prospective payment system – It could be reimbursed under B outside the bundle is what you're saying. You would be if their interpretation was right. Anything that comes onto the market after 2011 would not be part of Subpart B3. So unless you believe that it's covered by B4 or by some freestanding authority to expand the definition of renal dialysis services, then basically what it would mean is that every new drug that came on the market – And, again, this is the vast majority of dialysis care that's out there that's going through dialysis providers. All of those drugs, there would be a huge financial incentive for dialysis providers to immediately switch to those drugs because they would be out of the prospective payment system and able to enjoy the financial benefits that come from getting it separately reimbursed under Medicare Part B. And that's totally inconsistent with what NIFA was designed to do. Everybody agrees that what NIFA was trying to do was to address a system whereby the financial incentives were at odds with what were maybe the best treatment decisions for patients and the most cost-effective way to get those drugs to patients. And what's different about oral-only drugs from everything else that could be given to patients is that oral-only drugs, there's no financial incentive that exists for the dialysis providers because these are drugs that are not being administered by dialysis providers. They're not being taken during renal dialysis services. And, ultimately, the touchstone of the statute, after all, is that they're trying to create a system, a prospective payment system for renal dialysis services. The government doesn't dispute that this is a drug that's historically been taken outside of renal dialysis facilities. It's never been administered by renal dialysis providers. The label of the drug, in fact, cautions you and says, don't take this before dialysis. It's bad for you to do that, right? And I just want to clarify, the statute went into effect January 1, 2011, but the oral-only regulation was delayed until January 1, 2025. That's correct. Okay. That's correct. Right. The other problem is that the whole statute is preceded by the definition preceded by the board includes. Right. So I'm happy to address that. It surely contemplates that the agency will be able to add drugs as they go. No, I don't think so, Your Honor. What does includes mean here? Wouldn't that be a non-exhaustive list? So I'm happy to address that. They do afford talismanic significance. They say that the word includes is dispositive here of the idea that Congress basically intended for the agency to have the ability to add to the definition of renal dialysis. But so here's what the statute says. I think what they're ignoring is Part A of Part B14A of the statute, which says, for services furnished on or after January 1, 2011, the Secretary shall implement a payment system under which a single payment is made to a provider of services or renal dialysis facility for renal dialysis services, quote, as defined in subparagraph B. So the statute itself is providing that the prospective payment system is going to be defined by subparagraph B, not defined by the Secretary's addition to subparagraph B. And to be clear, that is a distinction between this part of the statute and many other parts of the statute. I'm sorry, Richard. I'm looking at A and B both now. Okay. Yep. A says that services for renal dialysis services, renal dialysis services, as defined in Section B. And Section B says, for this purposes, renal dialysis services included. Yes. Which would seem to say include, but it's not limited to. Again, I don't think that you can get that from the statute. I think that when they're saying define in subparagraph B, they're looking at the four exhaustive categories. Why would they look at that and not look at the word includes? Why would they have to put in exclusion for vaccines if there weren't otherwise some threat that they would be included? So there are a number of cases where both the Supreme Court and this Court has looked to statutes that include the language includes and said this is not intended to create a non-exhaustive list. Yes, it depends on the context in their cases both ways. That's exactly right. It does depend on the context. And I think here the relevant context is you have, so first of all, here we have the part of the statute that says, as defined in subparagraph B. I do think that they're looking at the four categories here. But there's more. Defined in subcategory B means that the definition in B has to be exhaustive? I think that it's telling you that the prospective payment system is set forth by the definition in subpart B. And I think the structure of subpart B and the four definitions there suggest that it's supposed to be exhaustive. You have a definition that's set up to address items and services that were in existence before December 2010 that are in the composite rate. Other provisions in this very statute in which they just say it defines as is, right, not includes, but just is. So the government makes a reference to those, and I think actually it's quite telling to look at that. So they say there's three other provisions in the statute that use the word means instead of includes. And so they say we should infer from that that Congress is making an intentional choice to treat this differently. But the three provisions that it refers to that include the word means, what they leave out from the ellipsis of all of those definitions is that each of those definitions defines either services, units, or something else, and it says as defined by the Secretary or as defined in regulations. And so let me just give you an example of one of those provisions because I think it's a helpful. And even means is not exhaustive. Well, I'm saying that means is being used in a way that makes clear that it's not intended to be exhaustive. Includes is intended to be exhaustive. I mean, I think what it shows is. It's counterintuitive. Well, no, I think it just depends on the context, right? And I think the more important, I think, takeaway from this. So let me just, for example, look to section. So this is 42 U.S.C. 1395 RRB 9, and it says for purposes of this subchapter, this term self-care home dialysis support services means, and then it has, you know, periodic monitoring, installation of equipment, testing, and then D, such additional supportive services as the Secretary finds appropriate and desirable. And the other two definitions that it points to involving means are written in a similar way. They rely on the Secretary's discretion. What I think that is showing is when Congress wanted to create a definition that either allowed the Secretary to set the definition entirely or to expand on the definition that was given by Congress, Congress said so. And here it did not. And I think that we have to take that difference significantly. The other thing I'll just point to. But oral only, it's not reflected in the statute or the legislative history. We think that you can understand that oral only is excluded by the fact that B3 is written to include, specifically call out and include oral equivalent drugs. If Congress had wanted a statute to include all drugs, it's pretty simple to do it, right? You just write a statute that says, you know, renal dialysis services include all drugs for the treatment of end-stage renal disease. That's not the way that the statute was written. The statute is written to allow for drugs and biologicals and the oral equivalent of those drugs and biologicals. That, in our view, suggests that drugs and biologicals was meant to include the kinds of services, the kinds of drugs and biologicals that renal dialysis providers provided, which are non-oral drugs. Now, phosphate binders predate the MIFA, and they've always been administered orally, though. They've always been administered orally, but they've never been part of the prospective payment system. So there's some strange language, I think, in the government's brief where they try to say that our drug is, or that our dialysis drug is the oral equivalent of drugs that are in the prospective payment system, but what they're referring to are phosphate binders, which didn't enter the prospective payment system until January 1st, 2025. And, of course, we would take issue with the idea that they're equivalent anyways. There are some significant differences. So the whole purpose of this statute is to have some sense of cost efficiency. So does your drug just not have a generic? It's not cost efficient. Our drug doesn't have a generic because it's a novel drug. Right. But let me just be clear about the kind of cost sensitivity that Congress had. MIFA was dealing with a situation where, basically, prior to MIFA, you had two ways that dialysis providers got reimbursed for drugs. I'm going to let you explain it, but I guess when I go to that question, maybe this is trying to encourage the generic as well. Well, the generic will—so the problem with this, and this is what numerous commenters have said, is that you'll never get generics because you won't even get the branded medicines in the first place. The problem with drugs going— And you could lower your price. The drugs will never get developed. The drugs will not get developed in this setting. With the current drug, you could just lower the price, exposa. The dialysis providers will not facilitate the prescription of these drugs, even if the prices were lowered. And I'll give you an example of this. You know, we have said throughout this case that the implication— the consequence of the government's decision is going to be to diminish access to drugs. So let's look at what's happened to phosphate binders, which everyone agrees. They've been around for a long time. There's lots of generics. They're less expensive drugs. The government said, when it was basically finalizing its policy, that this year they expected $870 million— they expected to spend $870 million to enable patients to get phosphate binders, based on the utilization of the drugs as it existed before oral-only drugs went into the binders. Just recently this year, they came out with their annual end-stage renal disease rule for the year, proposed rule for the year, and they said, now looking at it, we only expect to spend less than half of that amount on phosphate binders. And what that means is that more than half the people that were getting phosphate binders, people who need these drugs to have life-saving—you know, these are life-saving drugs— more than half of them are now not getting those drugs. And what it means is that— That's a policy decision by Congress. That's not—I mean, if Congress wants to save money and have less, I agree. Maybe that's not a policy I would adopt, but— Well, let me come back to what the policy that Congress cared about, and I think this will help explain why oral-only drugs would have been outside of the ambit of what would be included in the statute. What Congress was concerned about, and I don't think there's really a dispute about this, is that what was going on before MIPA is you had the composite rate system, which was a smaller system in which there were some drugs and some items and services, and then you had other drugs that were separately reimbursed principally under Medicare Part B. And the main one, the example that I think comes up the most is erythropoietin. And this was a drug where basically Congress reached the conclusion that dialysis providers had a significant profit incentive to overuse these injectable drugs that were outside of the composite rate system. And so the goal of MIPA was to take those kinds of drugs that dialysis providers had a financial incentive to prescribe and put them into one prospective payment system. Oral-only drugs are different because they are prescribed by nephrologists and self-administered by patients. Dialysis providers have no profit incentive to prescribe oral-only drugs. They're totally different from all the injectable drugs. They're also different from— So maybe this is just—so how does the reimbursement work? If your dialysis provider doesn't prescribe it but your nephrologist does, it's still one bundle per patient? Or how does this work? So before January 1, 2025, the way it worked is you would get reimbursement under Medicare Part D, under the prescription provision that you were referring to earlier. Now the way it works under the bundle is as follows. The way that the bundle payment works is that the agency sets an amount that basically dialysis providers get for every patient that comes through.  Yes, so it's per patient, but it doesn't account for the actual treatment needs of that patient, right? So some patients may be more expensive than that amount. Some patients may be less expensive. There are very small adjustments that can be made, you know, for treatment, but they don't account for the full cost of treatment. And so essentially you're getting a flat fee per patient. When you add additional drugs to the bundle, as has occurred with oral-only drugs, the bundle to begin with, even before oral-only drugs were in the bundle, the agency acknowledged that the rate that was basically being paid, the flat rate that was being paid, was either just break even or a negative margin, essentially, for the dialysis providers. So, you know, dialysis providers, when they're treating patients on Medicare, are already, like, losing money or just breaking even. When you add a bunch of drugs to it and you don't fully increase the cost to account for those drugs, all you're doing is creating a situation where there's a huge financial disincentive on the dialysis providers to facilitate. But the dialysist can still prescribe it. But what happens is that they don't in practice because the dialysis providers may clear through, like, their, you know, formulary setups or basically what they're going to accommodate at the dialysis facility. They strongly discourage, and in particular, the treatment using innovative new drugs. And we've seen this time and time again with the bundle. We point to in our brief, and I think you can look in our complaint at JA, I think it's 44 through 52, that's our complaint where we talk about drugs that have had the experience of going into the bundle. Some examples are Parsivib. This was a really important, this is an injectable drug even, that was used for hyperthyroidism. But doesn't that just support the conclusion that Congress made this policy choice, which is probably bad for patients, but it's still a policy choice. What they should have done was raise the price that they're paying for the bundle. But they didn't, and they just, like, put more things in the bundle. Maybe that was a policy error, but that doesn't mean we contort the statutory interpretation. They didn't mean to do something that it seems that they meant to do. I understand your question, Your Honor. The point is that it's the government that's contorting the statute. The statute that, you know, what Congress was trying to do, the policy choice that they made, was to take the kinds of drugs that renal dialysis providers were providing during renal dialysis services and put those into the prospective payment system. Oral-only drugs are outside of that. That's why the statute was written the way it was, to include only drugs and biologicals and the oral equivalent of those drugs and biologicals, because those are the ones where there is a financial impact and a financial incentive that affects the dialysis providers. And I recognize, you know, it's a statute that is complicated. There's interplay. But you said in the current year's report, the projected expense for the phosphate, I think it was called the hydroxyl phosphate drug, was about half of what it had been. Yes. And therefore, you said half as many people would get it. How is this? How is that? What's the middle that's missing between those two? Did the government say every other person gets it? I mean, what is it? I don't know. But I can tell you that the government had no explanation for why it was going to pay less than half for phosphate binders. It's not because of some difference in price. And I can tell you, I'm sorry, I'm getting rained on a little bit for some reason. The American Association of Kidney Patients, who's one of the clients that I represent, they did a survey this year to basically understand how patients and nephrologists are, you know, experiencing this significant change that's happened since January 1st. And what they found was that over 70% of nephrologists said that they're basically experiencing disruptions in their ability to treat patients with phosphate-lowering therapies and that a significant number of patients reported the same thing. So people who need these drugs, and this, you know, these drugs that, phosphate-lowering therapies, it's directly connected to, like, the mortality, you know, that a patient experiences. Do you think they're encountering obstacles? Adopt your rights of prescription and just don't get reimbursed? The point is that what's happening in practice is that the dialysis, the dialysis facilities have always had a big impact on what actually is prescribed. That's why, prior to MIFA, there was significant over-prescription of these drugs for which there was separate reimbursement, and that ended when they went into the prospective payment system. And that was being prescribed by the nephrologists? It's being prescribed by nephrologists, but nephrologists are interacting with the dialysis centers because these are patients that they're basically partnering in the treatment of. And so when a dialysis, if the administration of these drugs is now happening at the dialysis center and it's connected to the dialysis center's bottom line, the problem is that they then have an incentive to set it up in a way that discourages the nephrologists from providing that treatment. It says the only drugs that are available are these drugs, you have to do it this way, or we want you to do this drug first. Is the dialysis center getting reimbursed for a drug that isn't taken at the dialysis center? They are getting reimbursed. Well, now because it's part of the prospective payment system, they do get reimbursement through the bundled payment. And, again, we don't think that it's a sufficient reimbursement such that they are financially – you know, we're not trying to say they're evil actors. We understand, like, they're trying to provide a service and they have to make decisions too. But I thought you said that Congress intended that it would be things done during the dialysis service, but that's just not what the statutory language says. It says for the treatment of end-stage renal disease. Well, but the whole statutory definition is defining renal dialysis services. And I will tell you that the agency here, CMS, itself defines renal dialysis services to mean to exclude anything that's not necessary for the delivery of renal dialysis services. For the actual dialysis, but then that just doesn't square with for the treatment of end-stage renal disease, which is beyond what them just sitting there getting the dialysis. Well, again, I don't think that there's a dispute that the reason for the statute, it was all about trying to address the provision of dialysis services at renal dialysis providers. That's why the statutory language is set up in a way that talks about a single payment being made to a provider of dialysis services, to a renal dialysis facility. So the statutory language anticipates that this is a payment that's going to renal dialysis providers, and therefore the statute is set up in a way that is designed to be comprehensive about the kinds of drugs that are provided by renal dialysis providers as renal dialysis services. Is there any other indicated use for the drug in question here? There is a different indication that the drug is branded in a different brand name. So they are different products, but it is the same generic goes into it. But there is an application that's outside the end-stage renal disease context for this product. But only for the generic version? No, there is no generic. Okay. What I'm saying is the generic, in other words, the chemical. The chemical. That's a better way of putting it.  So the molecule can be used for something else in addition. Yes, that's right. Yes. But that's separate. Because it's under a different brand name, the way it's set up is that is reimbursable separately under medical Part D, but it's only for people who get that prescription. Right. And would you say that the bulk of prescriptions are for ESRG or for something else? I don't know the breakdown, but what I do know is that the prescriptions that this year, when we went from fourth quarter 24 to first quarter 25, the prescriptions for Exposa, for instance, there was a substantial drop. And I think what that's telling you is, again, these are people who were having this drug be prescribed, who need this drug. These are life-saving therapies and now have lost access as a result of what's occurred. So, you know, there's a reason why the patient advocacy groups in this case are on our side of the beach. Are people who are able to, allowed to pay for it themselves?  So if you don't have Medicare, you can pay for it. If you have insurance other than Medicare or means to pay, yes. But the reality is that the end-stage renal disease population is that this is such a debilitating disease that usually when you have end-stage renal disease, you can't work because you have to spend so much of your week going to dialysis centers. How much does it cost? I do not know that number offhand. I'm sorry. Was it historically covered in Part D? It was, yeah. It was historically covered under Part D, yes. Yes. So, you know, we recognize, again, we understand that the statute can be tricky, that there's a lot of things going on, but I think the important takeaway here is their interpretation of the statute, you know, even if you agree with their interpretation of V3, that cannot be comprehensive for what the statute includes with respect to drugs because there are many drugs that they've added to the bundle, including drugs that are injectable drugs that have come onto the market after 2011, that could not be part of the bundle unless they are right about the meaning of V4 or the idea that there is a, you know, that Congress was implicitly giving the Secretary authority to take this very nuanced framework that they created, according to them, about what drugs are part of the bundle and gave the Secretary the authority to totally undo that. We just don't think that's a reasonable reading of the statute. And I'll also point out, you know, ultimately, I think both parties talk a little bit about the legislative, the post-enactment legislative history. I don't think that it's dispositive for either side, but I will just point to two things. It never is. It never is, right? But I will just point to two things if it's helpful that I think are inconsistent with their view of the world. One is, of course, immediately after the closest, most contemporaneous evidence of legislative action in relation to this was that a proposal was made to amend the statute to specifically include oral-only drugs in the fall in Congress. That failed. And their whole idea, their whole premise of what Congress's intent here was, was that Congress intended all along for oral-only drugs to be part of the bundle payment. What has actually happened, of course, is that once CMS indicated their intent to put these drugs as part of the prospective payment system, Congress repeatedly pushed back the date on which that could happen. And if Congress intended all along for these drugs to go into the bundle, you know, back in 2011, it's really hard to understand why Congress would have kept pushing this off. But then isn't the flip side of your argument that they understood what the implications were and then they let this go into effect in 2025, knowing exactly what was going to happen? Yeah, well, I mean, and this is why I think you can't – it's not dispositive for either side. I think that the clearest thing that you can read from the post-enactment history is that Congress was aware of the fact that the agency had created this policy and there probably weren't sufficient votes to either reject it expressly or approve it expressly. And so in that kind of world, what Congress had available to it was to delay it and to put in place measures to study it if it ever took effect. And so, again, I don't think that's dispositive for either side. But I do think that their story of the world that, oh, yes, Congress from the get-go wanted to include oral-only drugs, it's really hard to square with what congressional action happened thereafter. Just kind of distinguishing back to the beginning about the jurisdiction versus the merits part. Yeah. Where the district court was indicating there wasn't subject matter jurisdiction, but CMS did not exceed its authority. However, the district court didn't make any findings related to the APA, yet still went on to find non-exhaustive lists, talked about the effective date of the January 1, 2025. I guess I'm asking about the district court going into the merits, but then is there anything that if we touched on the merits that should have gone back to the district court because they didn't complete the whole APA analysis? No. I think basically the question is squarely before you. I think essentially the right way to handle this case, I think, is for this court to reach the merits. If they agree with us that we're right on the merits of what the statute means, then the answer would be to find that there is jurisdiction to reach the challenge, that we're correct on the merits, and therefore to reverse the decision below and grant summary judgment to us. I know that I've gone well over my time, but if the court were to indulge me with a few minutes of rebuttal time, I would really appreciate that. Thank you very much. May it please the court, Chairwoman Lopez, on behalf of the government. Towards the end of the opening, the court got quite into the weeds of sort of policy decisions, which is precisely what judicial review bars are intended to foreclose. So I wanted, if I could, with the court's indulgence, just sort of zoom out a little bit and to talk about the two routes that the government thinks this case could be resolved on. First, we think that there is a very straightforward route. The question when looking at a judicial review bar is always, what is the plain text of the judicial review bar? What type of agency action comes within that judicial review bar? So in Amgen, for example, the review bar there in both Amgen and subsequently clarified in American Hospital, which was looking at the same overall different clause, same overall review bar, did specifically cross-reference other statutory provisions. So by expressly cross-referencing those statutory, other statutory provisions, it comes within the plain text of the review bar itself. Here, by contrast, so this is at subsection G, as we described in our brief, a bunch of the things for which Congress precluded judicial review did cross-reference other subparagraphs. This particular thing, Congress did not. It just said the—so what's precluded from review is the identification of renal dialysis services included in a bundled payment. And there's no question that this is—that's exactly what's happening here. And you can see that from, you know, for example, the relief requested in the complaint, which is at JA-56, where plaintiffs asked the court to declare that EXPOSA is not a renal dialysis service and is not subject to inclusion in the ESRB. That comes clearly within the plain text of the review bar, and we think that's all the court needs to do to resolve this case. But if the court, as the district court did, thinks that somehow this review bar sort of did incorporate that other statutory provision, we also think that the district court was absolutely correct that this clearly falls within the agency's statutory authority under that provision. And I do just—I think one of the biggest points of disagreement in this case, and I'm happy to talk through the statutory—you know, the particular statutory provisions in B-14 as well, is what Congress was doing. And here we actually do think what Congress did was dispositive. What Congress did is to say after—so in 2010, CMS issues a final rule that says oral-only—not just oral-equivalent drugs, but also oral-only drugs are going to come into this bundle. Faced with that, what Congress does is not say, hey, actually, you're wrong. The statutory language precludes you from deciding to do that. And so we talk about this principally at pages 45 through 46 of our briefs. We go through these public law enactments. So in 2013, Congress does three things, and these are incorporated into the language of the public law, so there's no sort of question about did different people have different ideas. This is what, despite the fact that there may have been some agreement, what Congress together came up with and enacted. And so the first is in pushing back the date, the effective date for the first time, Congress instructs that the agency may not implement the policy under—and this is where it was the regulation was at the time— under Section 413.174.F6 of Title 42 Code of Federal Regulations relating to oral-only ESRD drugs in the ESRD perspective. Payment system delays that until 2016. It then tells HHS to monitor the bone and mineral metabolism of individuals, and this particular condition here falls into that general category with end-stage renal disease as part of its, quote, implementation of oral-only ESRD-related drugs in the ESRD perspective payment system under subsection B14. So again, acknowledging that obviously the agency had the authority to include this. And it, you know, orders studies to see what the effect of the implementation— and this gets to Judge Pan's question earlier about sort of is this a policy choice that Congress made, and what Congress does, too, during the period of time of delaying the effective date is to say, GAO, can you submit a bunch of studies that look at the impact? And so it does this in 2013. It does this in 2014. But what Congress doesn't do is after those studies come back, it's changed the statutory language. It just kicks back the effective date again, and then incredibly crucially— and this is something that I didn't hear addressed at all in the opening or really, you know, fully engaged in the reply brief. Congress also adds things to the statute that just wouldn't make sense, and actually it's not just a question of surplusage, couldn't have any meaning if plaintiffs were right. And so specifically, these are two things that happen in the 24—2014 to the public law number 113-93, section 217. Two things. So first of all, Congress adds there are these quality—so one of the ways that Congress deals with some of the policy problems we were talking about, about being worried that dialysis facilities might not prescribe—you know, might have perverse incentives not to prescribe things, is to say there are going to be these quality control or performance measures. If a renal dialysis facility doesn't meet the measure, they get a 2—they can get, at the secretary's discretion, up to a 2% reduction in the payment—in the composite payment rate they're getting. So there's bite to that. And Congress specifically adds a measure that, quote, is specific to conditions treated with oral-only drugs. Now, why would there be a measure by which renal dialysis facilities' composite payment, this very bundled payment we're talking about, could be reduced by 2% if they weren't doing a good job with conditions associated with these oral-only drugs? It just would have no meaning. And similarly—and this gets to some of the discussion about how the agency's authority under the general provisions, you know, as the government has explained, makes the most sense to think about this under—before Congress also— so this is at 128 statute at 1062. It's called the drug designations provision, and there it instructs the secretary to—it says the secretary, quote, shall establish a process for, one, determining when a product is no longer an oral-only drug. So it assumes that oral-only drugs are in the bundle. And two, so the process would also provide for including new injectable and intravenous products into the bundled payment under such systems. And those provisions just don't have meaning if Congress didn't understand that oral-only drugs could come into the bundle. And I'm happy—and just one sort of—now, again, I do want to— That's discussed in your brief, Laura, is that in your brief? Yes. Yes, Your Honor. Access, the written version. The—so sorry. So the primary discussion is at pages 45 through 46 of our brief. And that really lays out this argument. So 45 through 46 of our brief, I think we talked primarily about—we refer to it as the DAPA program. It's also, of course, in the background section of our brief, which I apologize. I don't remember off the top of my head exactly which pages those were. So it's in the background section when we talk about how the statute was enacted. In the merits section—in the argument section of our brief, we talk about this primarily at pages 45 through 46. And I believe we also talked about the—and my apologies for not remembering. And then also page 56 talks about the DAPA program. So those are the merits sites. And I apologize for not having the statutory background. You know, the— And so we really think what Congress has done afterwards really confirms everything that the agency said. But I'm also happy to walk through our view of what comes in through B-3 and B-4, although I can also say that we largely agree with the way the court has—the court's earlier questions elucidated those provisions. A couple of things. So if B is meant to be a non-exhaustive list of the renal dialysis treatment services, could those renal dialysis services encompass all drugs that could treat any of the end-stage renal disease? I'm trying to figure out if Congress is kind of—or what are—are there any limiting principles on that? Because we talked about the word includes to be non-exhaustive, and then we're bringing this drug in. But then what about anything else? I'm just trying to make sure that we can draw the lines on this. Thank you, Your Honor. You know, I think those questions are—we're always hesitant to go, especially as the government, to go outside of, you know, I don't know what the agency would do in a future circumstance. What I can say, and I assure Your Honor, is that the agency, you know, hasn't just said everything can come in. What they did in that 2010 regulation is to sort of make two decisions. There were two potentially limiting principles. One limiting principle was, does it matter what the route by which patients get this is, you know, whether it's oral or intravenous? And they said no. If I might just put a pin in the rest of the answers to Your Honor's question, I did just want to clarify something that I think might have gotten muddled factually before, which is the question of whether renal dialysis facilities can furnish these oral drugs. Of course, given the fact that B14 expressly contemplates that oral equivalent drugs can be furnished by renal dialysis service centers, there's no reason to think that that would be any different for oral-only drugs. And we talk about this as well in our brief. So in the final rule, 75 said reg at 49043. One of the reasons that HHS actually originally had statutory authority to kick out the date itself until 2014 for these oral-only drugs, one of the reasons it said it was doing that was to give renal dialysis facilities more time to figure out how to either have in-house pharmacies that could provide and furnish these directly or relationships with other pharmacies through which they could get the drugs to furnish to the patient. I just sort of, you know, it doesn't mean that it's not for the treatment of the disease, if your doctor gives you something to take home with you to keep up with treatment. But, yes, so sorry. So to get back, that was a very long-winded aside. My apologies. But to get back to your honors question about the limiting principles. So one is, does the route of administration matter? The answer was no. We think that what Congress did subsequently to sort of confirm that that is a choice that the agency was entitled to make. And then the second one was the agency created functional categories to decide, are these conditions so sort of tightly related to the treatment of end-stage renal disease that it makes sense for them to come into the bundle? And so there are five general categories. The category that's most relevant here is the—and so it does that, and it also does three things. So it identifies five general categories that are basically anything used to treat these types of disease—you know, these types of conditions that fall within these categories always in the bundle, putting it in a little colloquially. It also created several categories that it said these are always excluded from the bundle. And then it also created one sort of set of things that sometimes that medication can be used to treat end-stage renal dialysis disease, and sometimes it can't, and sort of says these are sometimes in the bundle, sometimes not in the bundle, and we'll know by sort of how it's built out the description of what it was supposed to do. And so I absolutely understand Your Honor's concern. Again, in light of the judicial review bar, the agency's exact calls on that are sort of precisely the thing that Congress didn't want open, you know, I think that's in the course of litigation, but I can assure Your Honor that the agency has really thought through this. And then under B3, could that be read to include drugs developed after January 1, 2011? Yes, and so something that the district court described cogently, and we also briefly described, you know, because we think the question here is easy with respect to oral-only drugs because, as elucidated earlier, Congress expressly made the effective date for oral-only drugs January 1, 2025. There's no dispute that Exposo was separately paid under Medicare Part D before it came into the bundle. So we think that question's really easy here, but we think more broadly as well that what Congress said here was after application of this paragraph, it didn't say, you know, after, you know, on or after January 1, 2011, which it did do in other. So if you just look at that Roman numeral I there, the first set of items is items and services included in the composite rate for renal dialysis services as of December 31, 2010. So in that same definitional section, Congress certainly indicated that it knew how to limit something to a specific date. And then, you know, as we were discussing as well, Congress certainly contemplated that the agency had authority to bring in new intravenous drugs because it told HHS to establish a process for doing so. And sort of more generally, as we think that this report laid out so well, this really was a system in which Congress intended more things to come into the bundle and has confirmed, you know, through certain legislation like telling, you know, that there's a floor of things that can be brought, that must be brought in, and then new things as new drugs are developed, they should be brought in as well. And I just want to know how far we should go in the opinion. Should we merge jurisdiction with the merits so we have a limited review, then rule about the non-exhaustive list, and then just go to B3 with respect to the date? So the government's preference would be to, for a ruling that the court actually doesn't need to look at the definition of renal dialysis services because unlike an Amgen, an American hospital, this particular subprovision does not cross-reference other statutory provisions. And the challenge agency action here clearly falls within the plain text of the provision itself. So that's first order how we would prefer. And we think that will actually add a lot of clarity in this area that you only look beyond the review provision to figure out whether something is that type of agency action shielded under review when the judicial review provision cross-references something such that it effectively comes into the review. As a second order of preference, we think that to the degree that the court agrees with the district court, that this particular statutory provision is the way the statute was written, does come into the plain text of the review bar itself, then we do think that the statutory language quite clearly encompasses this authority. Again, we think that that's sort of the clearest way to do. One of the cleanest, most straightforward routes of doing so is that plaintiff's analysis can't be squared with the subsequent changes to the statute. Both Congress not saying, you know, after being fully aware that HHS was adding this oral-only drugs in the 2010 rule, not saying you can't do that, but just putting out the effectiveness date. This isn't a case—sometimes Congress doesn't know exactly what's happening. We know Congress knew exactly what was happening, and they kicked out the effectiveness date, and they also included those two provisions that we were talking about that just wouldn't have any effect. And those—so the provision for the process of determining that something isn't an oral-only drug and then including it in the injectable equivalent, so that's codified at the note to 1395 RR, and the quality performance measurement that I was talking about earlier is codified at 1395 RR H2E. And I just haven't heard how those could work if that's not what—if Congress didn't think oral-only drugs could come in. Anything further? If there are no further questions, we'd ask them in the court room. Thank you, Ira. I'll just make a couple of brief points. First of all, my friend relied principally on the post-enactment history. Let me just be really clear, because I think that the main statute that she was relying on actually points in the other direction. So she pointed to the statute from 2014 that says that the secretary shall establish a process for, one, determining when a product is no longer an oral-only drug, and two, including new injectable and intravenous products into the bundled payment. The reason why the secretary was determining a process for when a product is no longer an oral-only drug is because at that point it entered into the bundle, okay? This is in a world in which oral-only drugs were excluded from the bundle, and so what Congress was saying is we know oral-only drugs are excluded from the bundle at this point, but make sure that there's a process that if there ever becomes an injectable equivalent, then it will become an oral equivalent of something that's in the bundle, and it can then go into the bundle. Is that clear? Okay. Sorry. Let me load that. The process is for determining when a product is no longer an oral-only drug. Let's say that right now, for instance, EXPOSA is an oral-only drug. There's no injectable equivalent. If there were to be an injectable equivalent at the time when the statute was enacted, so if there was no injectable equivalent at the time when the statute was enacted, it would not be part of the prospective payment system. Oral-only drugs were at that time already excluded until 2025. If an injectable was approved at that point, it would become the oral equivalent of an injectable drug. Injectable becomes an oral equivalent? It's an oral drug that would be equivalent to an injectable at that point in time. So in other words, if an injectable comes out, now this oral drug, which has already existed, it's now an oral equivalent drug. I see. But what that means is that... Does that ever happen? The things that were injectable are no longer... It has happened where there are oral drugs that are injectable. It can happen. You're right. It's not the most common thing to happen, but that's what Congress was getting. I mean, I don't think there's any... I don't think there's a dispute that that's what Congress was getting. I didn't get it because I think that was very uncommon. Yeah, but what's important there is that what that's suggesting is that Congress is saying that, okay, in a new injectable drug after 2011, we assume that that would be part of the bundle. But again, their argument is that you have to understand... What's consistent with their reading is that under the statute right now, the oral only thing only goes to things later. But now they're saying the injectable ones too. That's consistent with their reading. No, no, no. No? No. What they're saying is that they're saying that oral only comes in if it's... They're saying... Bless you. Oral only drugs come into the bundle if they were separately paid before 2025 today. But this statute was... Okay. Yeah. That's the alternative reading. No, no. That's what they're saying. Okay. Yeah. I mean, we think that that's wrong. But again, this statute basically, and also it's adding new injectable and intravenous products. So just to be clear, I thought that their interpretation is for the things before the whatever, this paragraph goes into effect. Yes. It's all drugs and biologicals, including orals. Yes. Yes. And then the second phrase is for things after this paragraph that are orals. Oral equivalent, not oral only. So let me be clear about that, because I want to... And this is what I really wanted to underscore. If the court rules for them, they are masking the utter chaos and the significant consequences that will occur for the end-stage renal disease population. Under their rule, this is their view of the statute, is to say that B3 applies to products for which there was separate payment before the application of this paragraph. Whether you think that for oral drugs, that was 2011 or 2025, certainly everybody agrees that for intravenous and injectable, it was 2011. But in either case, what it means is that any new oral-only drug or any new intravenous drug would be outside of the bundle. So we basically have like a regime that's like the opposite of what Congress intended. Congress wants drugs that renal dialysis providers provide at any time. This is... You know, our view of the statute is that... I'm sorry. It would be inside the bundle, not outside. No. Their reading would make it outside B3, because it only would be part of B3 if it was separately paid before the application of this paragraph. So if a drug comes out January 1, 2026, it would never have been... So how does the second clause work? The second clause has no application to any drug unless it is the oral equivalent of an injectable or intravenous drug that was on the market before 2011. And again, that's why their reading of the statute doesn't make sense. Their whole reading is that the only things that go into the bundle, the only new products that go into the bundle are drugs that are the oral equivalent of intravenous and injectable drugs that were on the market before 2011. There is no policy reason. I didn't hear anything...  Or 2025 in that case. There is no reason why Congress would have written a statute that does that. And if Congress had created that very, very nuanced version of what the statute does, it's impossible to imagine that B4 could be read in the way that they suggest to basically undo that statute, or that some sort of special extra authority could be inferred that would allow the secretary to completely undo that extremely nuanced framework. I mean, even if you believe that the word includes, in general... And again, we think the case law is clear that it's context-dependent, and we pointed to all the things that are, I think, telling signs here, clues that the court should look to. But even if you thought that the secretary had authority to expand on the definition of renal dialysis services, cases like the Financial Planning Association that we point to in our brief make clear that when the statute already addresses a subject in a nuanced way, some sort of, like, catch-all authority or additional authority can't be used to undo the specific choices made by Congress. And if what they are saying is that Congress created this very unusual, nuanced regime that has no policy justification... I didn't hear any today. There's none in their brief that explains why they would have set up B3 in that way. But you certainly, like, couldn't view that as having made that nuanced choice that then read the rest of the statute to undo that nuanced choice. The ultimate takeaway from all this is just that their version of the statute doesn't make sense, and it's not consistent with what Congress was trying to do in NIFA. And I just want to leave you with this. So what's your reading? If their reading is what you just described, your reading is? Our reading is that what B3 was doing is it was adding to the bundle all drugs and biologicals that before application of this paragraph would have been outside of the composite rate system. So, in other words, any drug that would have otherwise been reimbursable under Part B or Part D that is for the treatment of end-stage renal disease goes in. It doesn't matter when it came out. It doesn't matter if it's before 2011 or after 2011. It's all drugs. And that is essentially how it was consistent with the statutory provision that even they rely on. But you think only the intravenous ones. Intravenous. Yeah, anything that was injectable intravenous or the oral equivalent thereof. And, again, the reason why that would have been the line that Congress would have drawn is because it's intravenous and injectable drugs that dialysis providers are using in renal dialysis services. That's where the financial incentives that Congress was trying to address. The timing thing doesn't matter. Yeah, the timing thing doesn't matter because it doesn't make any sense. Why would Congress have? So your position is that all drugs and biologicals that were outside the bundle are now in and they're oral equivalent. But your client is not an oral equivalent because it's oral only. That's exactly right. The only thing that falls out is oral only. And the reason, again, is because oral only drugs are the opposite of the kinds of drugs that Congress would have put in. I mean, if the purpose of Congress in enacting MIPA was essentially that they were concerned about the fact that for-profit dialysis providers were going to prioritize financial incentives over patient care, it would make no sense to take the one kind of drug, oral only drugs, for which there are no financial incentives, and then add those to a bundle where they're now subject to those very financial incentives that are going to skew the patient care. And I just want to leave the court with this. And, you know, we're passionate about this subject because this really is an incredibly destabilizing, life-threatening disease. There are over 500,000 Americans that have end-stage renal disease. It's incredibly debilitating. It requires dialysis three times a week in order to survive unless you get a new kidney. And the five-year mortality rate, you know, only 30 to 35 percent of people survive five years once they're getting dialysis. So this is a population that faces tremendous health challenges. It's disproportionately poor, minority, rural, and this policy that the agency has enacted here is something that advocates from across the kidney care community have been warning for years is not only a wrong reading of the statute, but incredibly harmful from a policy perspective. And that's why the patient advocacy groups are on our side of the V, and the government can't point to a single commenter that supports their view of the world or their view of the statute. As I noted, we're already seeing that diminishment of access, and I thought it was quite telling that the government had no response to that when it was up here. It didn't disagree with my figures. It didn't disagree with what's happening in the real world. And I would just encourage you. I know that this is a very tricky statute, but their view of the statute does not make sense. It has no connection to the purposes of NIFA, and we don't think it's a faithful reading of the fact that Congress chose to call out to add oral equivalent drugs, but not to add oral-only drugs on the face of the statute. We would urge you to reverse.  I'd like to take just a minute.
judges: Childs; Pan; Ginsburg